Gantt, J.
By act of the legislature, approved February 2d, 1857, the city of Omaha was incorporated, and by virtue of this act, and acts supplemental and amendatory thereof, it has been and still is a municipal corporation. On the 10th day of July, 1874, it entered into a written contract with A. J. Hanscom to grade St. Mary’s avenue, and a part of Howard street, according to certain plans, specifications and profile of grade, for a certain specific sum of money to be paid as follows: one-half in warrants to be drawn on the general fund, and one-half in war *343 rants to be drawn on a special fund to be raised by-assessment to be levied on the property abutting on the line of said street and avenue. The plaintiffs allege that the contract with ITanscom changed the grade of St. Mary’s avenue, established in 1866, and the grade of Howard street established in 1868. The defendants deny that any such former grades were established, and aver that the grades of said streets were first established in 1873.
It appears that on the 29th day of July, 1873, an ordinance was passed by the city council and approved by the mayor, entitled “an ordinance establishing the grade of St. Mary’s avenue.” This ordinance defines what the grade shall be, but it does not appear that any further steps were taken in the matter until the contract was made on the 10th day of July, 1874, with Hanscom, who within a day ortwo thereafter commenced work under his contract. On the 18th day of July, 1874, the mayor appointed appraisers to assess the damages to owners of property abutting on the streets then being graded; on the 21st of the same month the appraisers made a report, and the damages by them assessed were tendered to the property owners. In respect to the grade established in 1866, evidence was offered on the hearing of the cause. The fact to be ascertained from the proofs, is not whether the council made a complete record of all its proceedings, but whether the grade was officially established on the avenue at that time. The minutes of the council show that on the 11th day of April, 1866, a report of the city engineer was made in relation to the establishing of streets in the southwestern part of the city; that on the 18th day of the same month he was by resolution of the council directed to re-survey and locate the proposed extension of Howard street, and on the 25th day of May in the same year, the council adopted, ratified and confirmed the report of the engineer, and directed the *344 street commissioner to cause the streets to be opened for public use “as platted by the engineer and placed'on file with the city clerk.” Again on the 12th day of July, 1866, the city engineer submitted a report of grade, and at the same time it was by the city council resolved “ that the profile and proposed grade reported by the city engineer, of St. Mary’s avenue, now on file be and the same is hereby adopted as the grade of said avenue within the limits designated by such profile.”
E. Dutton testified that he was city engineer since 1874, and that the profile showing the grade of St. Mary’s avenue, purporting to have been made in 1866, was kept in his office, but he don’t know who prepared it, and has never seen any record of it. B. E. B. Kennedy testifies that he was city solicitor in 1866-7; that the profile in question was made by one Barnard, who was then city engineer; that he saw the profile when Barnard reported it, and identifies it to be the same one upon which the proceedings of the council were had at the-time, and also says that he frequently referred to it. We think this evidence was properly admitted, and that the proofs clearly show that the grade of St. Mary’s avenue was officially established by the council in 1866. The above statement, substantially, contains all the facts material to the questions raised on the argument of this cause; and the questions presented for consideration may be comprised in the following propositions:
1. Whether the power conferred on the city council, by act of March 28, 1873, to collect one-half of the expense of grading a street by special tax or assessment on lots and pieces of ground abutting thereon, is unconstitutional and inoperative.
2. Whether the proceedings of the council changing the grade of a street, without having first caused the damages to owners of property abutting thereon to be ascertained and tendered, are without authority and void.
*345 The first proposition has special reference to the right of taking private property for public use; and the power of the government and the rights of the citizen in regard to taxation and the right of eminent domain, are clearly defined and explained by Judge Ruggles in the case of The People v. The Mayor of Brooklyn, 4 New York, 422, to be as follows: “Private property may be constitutionally taken for public use, in two modes: that is to say, by taxation, and the right of eminent domain. These are rights which the people collectively retain, over the property of individuals, to resume such portions as may be necessary for public use. The right of taxation and the right of eminent domain rest substantially on the same foundation. Compensation is made when pri-' vate property is taken in either way. Money is property. Taxation takes it for public use, and the taxpayer receives, or is supposed to receive, his just compensation in the protection which the government affords to his life, liberty and property, and the increase of value of his possessions by the use to which the government applies the money raised by tax. When private property is taken by . eminent domain special compensation is made. Taxation exacts money or service from individuals, as due for their respective share? of contribution to any public burthen. Private property taken for public use by right of eminent domain, is taken, not as the owner’s share of contribution to a public burthen, but as so much beyond his share.”
These elementary principles are essential to the maintenance of an enlightened and' responsible government, and when reduced to a single, axiom in the functions of government, it is this: Taxation exacts from the individual merely his proportionate share of contribution to a public burthen, and whatever is taken beyond this, is an exercise of the right of eminent domain. Now, if the first proposition is considered in the light of these fundamental principles, and independent of any affirmative *346 constitutional provision, I think it should, be answered in the affirmative. If the taxing power can only require the individual to contribute his proportional share to the public burthen, upon what principle of ethics, can an assessment against him, as provided for in the statute, be denominated a tax? It seems to me that the injustice of such assessment obtains by reason of its not being co-extensive, as in ordinary taxation, with some one of the civil sub-divisions into which the state is divided for governmental purposes, and by reason of the fact that it is taking the property of a few individuals to pay the expense of making a public highway or street, over and upon which every citizen of the whole city has the same absolute right of use as the individual whose money or property is taken to make it. Those who are compelled to pay for the work, are entitled to no peculiar use of the street not common to the public generally. But it is said that human wisdom cannot devise a system of taxation which will produce complete equity in respect to the apportionment of taxes and the benefits to arise from their expenditure, and, therefore the theory upon which this right to take private property by assessment, is based on the ground that the law assumes that by reason of the work being done, special benefits accrue to the persons against whom the assessments are levied. But upon what principle can the right of the government be maintained to tax the citizen to make improvements for his own benefit? According to the principle upon which the right of taxation rests, the question in regard to the propriety of making a highway or street for public use, is not whether it will benefit some individuals, or greatly injure others, but whether the public convenience or necessity requires the work to be done. It is not properly the business or purpose of government to improve the private property of individuals, and then by an exercise of arbitrary power compel them to pay the cost of such *347 improvement. I think it will not be claimed that the exercise of such power belongs to the functions of good government, and yet to maintain the theory of such assessments, must necessarily imply the exercise of such power. Therefore, it seems to me, upon sound principle, that when a public highway or street is needed, it is the duty of the government to make it, or if it is not needed for public use, then the public have no right to make it.
Justice Campbell, in au elaborate discussion in support of the proposition that the right to make improvements and charge the cost to the property of individuals, upon the theory of private benefits, cannot be sustained on principle — referring to the ease of The People v. Mayor of Brooklyn, defining the distinction between taxation and the taking of private property by right of eminent domain, says: “I am unable to see how, under such a distinction, that can be regarded as a legitimate exercise of the taxing power, which requires more than a proportionate share to be contributed. It does not follow because the power is not that of taxing property for public use, that it is the taxing power. It may be neither, and illegal and arbitrary for the reason that it is neither.”
Judge Christiancy says, that “to compel individuals to contribute money or property to the use of the public without reference to any common ratio, and without requiring the sum to be paid by one piece or kind of property, or by one person, to bear any relation whatever to that paid by another, is, it seems to me, to levy a forced contribution, not a tax, duty or impost within the sense of these terms, as applied to the exercise of power ■by an enlightened and responsible government.” Woodbridge v. Detroit, 8 Mich., 291-306.
Justice Paine, in delivering the opinion of the court in Weeks v. Milwaukee, 10 Wis., 258, says in reference to making a street, that “ it must be for a public purpose; and it being once established that the construction *348 of streets is for a jtublic purpose that will justify taxation, I think it follows, if the matter is to be settled on principle, that the taxation should be equal and irniform, and that to make it so, the whole taxable property of the political division in which' the improvement is made, should be taxed by a uniform rule for the purpose of its construction.” And in respect to the system of enforcing special assessments on the ground of private benefits, lie says: “ I think this is the same in principle, as it would be to say, that the town in which the county seat is, should build the county buildings, or that the county where the capital is located should construct the public edifices of the state, upon the ground that by being located nearer, they derived a greater benefit than others.” And now, from a careful examination of the subject, I am constrained to say, in the language of Justice Paine, that “ if the question was whether the assessments should be sustained on principle, I should have no hesitation in deciding it in the negative.”
But in the determination of the first proposition, the question is not simply whether the theory of special assessments is sound in principle,, or inequitable and unjust in its operation, but whether the legislature has power under the constitution to establish such a system. And I think this legislative power is recognized in the 4th section of Article YIII of the constitution. It is declared that the “ legislature shall provide for the organization of cities and incorporated villages by general laws; and restrict their power of taxation, assessment, borrowing money, contracting debts, and loaning their credit, so as to prevent the abuse of such power.” The constitution of Wisconsin contains a similar provision, and after an elaborate discussion of the meaning and effect of the word “assessment” as used in the constitution, in the case of Weeks v. Milwaukee, it seems to have been the unanimous opinion of the court that the word had refer *349 ence to the special system of assessments for municipal improvements -which had existed and given rise to so much discussion and litigation in other and older states; and although the system has been so far separated- and distinguished from general taxation, as to have obtained the distinct name of “ assessment,” yet the word as used in the constitution is a clear recognition of the existence and legality of the power. The constitution of the state of New York also contains a similar provision, and the decision in the case of The People v. Mayor of Brooklyn, seems, in some measure, at least, to be based on this constitutional ground, for Judge Euggles says that “ the constitution in this section recognizes and affirms the validity of the legislation by which city and village assessments for local purposes like that now in controversy, are authorized, and it seems to remove all doubt in relation to the legislative power in question.” Hines v. Leavenworth, 3 Kansas, 186. Railroad v. Connelly, 10 Ohio State, 166.
I must conclude that the word “assessment” as used in juxtaposition to that of “taxation” in the constitution has a specific meaning, and includes all the steps necessary to be taken in the legitimate exercise of the power, just as taxation includes all taxation generally; or in other words that the authority to levy and collect “ assessments ” for municipal improvements is an express constitutional power, resting alone upon constitutional authority.
The second proposition involves the consideration of many important questions. The authority to levy special assessments is found in section forty, of the act of March 28, 1873, which provides that the “mayor and council of any city governed by this act, shall have power to establish the grade of any street, avenue or alley within the city, and when the grade of any street, avenue or alley shall have been established, such grade shall not he changed, except by a vote of two-thirds of the council, and not then *350 until the damages to property owners, which may be caused by such change of grade, shall have been assessed and determined by throe disinterested appraisers, who shall be appointed by the mayor and council for that purpose, who shall make such appraisement, taking into consideration the benefits, if any, to such property, and file their report with the city clerk within ten days after receiving notice of their appointment, and the amoumt of damages so assessed shall he tendered to such property owners or their agents before aovy such change shall he made
Upon application for the change of a street grade, the council must determine as to the propriety of making such change. But the determination of this question, not only involves the inquiry as to whether the public necessities require such change to be made, but it seems that under the provisions of the law conferring the power, the council shall first ascertain the damages which such change of grade shall occasion to the owners of property abutting on such street, and should also have a reliable estimate of the cost of grading, and then under all the circumstances and conditions of things at the time, it can intelligently determine whether the work of such change of grade should be undertaken or not. Again, the exercise of this power, and the execution of the necessary subsequent proceedings, dependent thereon, may necessarily affect rights of property, and therefore the action of the council in such case in the first step taken in its proceedings, may result in divesting the title to real property of one citizen and transferring it to another; and this effect of its action seems clear and unquestionable when we take into consideration the fact that the act provides that the city treasurer, upon the proper certificate delivered to him, describing each lot or piece of ground subject to assessment, and stating the amount assessed thereon, shall, after giving the required notice, proceed *351 to collect such assessment or special tax by distress and sale of the personal property of the person or persons against whom the same is' assessed; and providing further, that whenever personal property cannot be found, a complete delinquent list of .all lots and parcels of real estate, upon which such assessments remain unpaid, shall be delivered to the county treasurer, who shall advertise and sell the same for the payment of such delinquent tax or assessment, at the time he sells real estate for delinquent county tax. The statute also makes such special assessment a perpetual lien upon the real estate from the day it is levied. All these questions are involved in the consideration of the general proposition, and with them in view I now approach the' inquiry whether the provisions of the statute, as above quoted, are to be regarded as mandatory or directory merely.
It sometimes becomes a very grave question in the construction of statutes, whether particular provisions are to be regarded as mandatory or directory. It is, however, a familiar principle that statutes relating merely to matters of convenience, or to the orderly and prompt conduct of business, and not to the essence of the thing to be done, are generally considered as directory only; but this doctrine has been carried so far in some cases, that it seems impossible to reconcile all the cases in which the question has been considered; and if equal force were given to each case found in the books, it would be a fruitless effort to attempt to fix any settled, discriminate point between a mandatory and a directory statute. Hebard, J., in Briggs v. Georgia, 15 Verm., 72, very justly observes.: “I am not well satisfied with the summary mode of getting rid of a statutory provision by calling it directory. If one positive requirement and provision of a statute may be avoided in that way, we see no reason why another may not.” And in District Township v. Dubugue, 7 Iowa 276, it is said that “ affirmative words *352 may, and often do imply a negative of what is not affirmed, as strongly as if expressed. So, also, if by the language used, a thing is limited to be done in a particular form or manner, it includes a negative that it shall not be done otherwise. Affirmative • expressions that introduce a new rule, imply a negative of all that is not within the purview.” But it is deemed unnecessary to enter into a review of the authorities upon this question.
It will be conceded that the powers of a city council are not derived from the common law; that its only power to act, in any case, is derived wholly from the statute; and therefore it possesses no power but such as is expressly granted by statute, or may be incidentally necessary to carry into execution the power expressly given by the statute. It may also be laid down as a general rule, that the power given must be exercised in the mode prescribed by the statute. Hence, when the statute prescribes a particular mode in which the corporation is to act, it can only act in the mode prescribed. To sanction a contrary doctrine, it seems to me, would place the corporation above the law, and would, to say the least, be fraught with dangerous consequences. If such a doctrine should prevail, is there not reason to fear that corporations might soon become intolerable nuisances? But however this may be, with all due deference to the authorities upon the question of construction, it seems to me, from the most replete examination I could give the subject, that the following rules may be laid down as a safe guide in the interpretation of statutes, relating to the question under consideration:
1. That when the particular provision of the statute relates to some immaterial matter, where compliance is a matter of convenience rather than substance, or where the directions of the statute are given with a view to the proper, orderly, and prompt conduct of business merely, the provision may generally be regarded as directory.
*353 2. When a fair interpretation of the statute, which directs acts or proceedings to be done in a certain way, shows that the legislature intended a compliance with such provision to be essential to the validity of the act or proceeding, or when some antecedent and pre-requisite conditions must exist prior to the 'exercise of power, or must be performed before certain other powers can be exercised, then the statute must be regarded as mandatory. And under such statutory provisions, the corporation has no election in the matter as to how or when the duties shall be performed, and municipal officers have no option or authority to act differently from the mode particularly prescribed. And if there be manifest irregularity in the proceedings, presumptions are not indulged to sustain such proceedings, or to give new character to that which is seen to be defective, or to supply the place of that which is not apparent.
3. When the statutory provision relates to acts or proceedings immaterial in themselves, but contains negative terms, either expressed or implied, then such negative terms clearly show a legislative intent to impose a limitation, and therefore the statute becomes imperative, and requires strict performance in the mode or manner prescribed. People v. Schermerhorn, 19 Barb., 558; 1 Kent, 461, et seq.; Inhabitants of Veazie v. Inhabitants of China, 50 Maine, 526; People v. Supervisors, 11 Abbott, 104.
Now, according to these principles, it seems clear that the provisions of the statute are mandatory. They provide that when a grade has been established it shall not be changed- until the damage to property owners which may be caused by such change shall have been assessed and determined/ and that the amount of damages so assessed shall be tendered to the property owners or their agents, before any sxich change of grade shall be made.
The power conferred concerns both the' public and *354 individuals, and the mode in which the exercise of it is prescribed, is accompanied with very strong negative terms. However the mayor and council, wholly disregarding the mode of procedure prescribed by the statute, and without having any data whatever, from which, under the circumstances and condition of things, at the time, they might decide whether it would be advisable for the city to incur the expense and liabilities of such an enterprise, have attempted to establish a change of grade, and to contract for the grading of the street. Is not such a proceeding a plain violation of the statute? It is said that “no principle is more firmly established or rests on a more secure foundation, than the rule which declares, when a law is plain and unambiguous, whether it be expressed in general or limited terms, that the legislature shall be intended to mean what they have plainly ex.pressed,” and again that the intention of the legislature should control absolutely the action of the judiciary. "Where that intention is clearly ascertained, the courts have no other duty to perform than to execute the legislative will, without any regard to their own views as to the wisdom or justice of the particular enactment.” Sedg. on Stat, and Con. Law, 325. Ho not these rules of law apply with much greater force to the action of a city council in the exercise of merely delegated powers? But the statute in question imposes a limitation on the exercise of the power delegated, requiring a condition precedent to be performed, and until this pre-requisite is complied with, it seems clear that the council acquires no jurisdiction of the subject matter. The restriction is absolute, and therefore the exercise of the power in any other way than that prescribed, renders the proceedings void. Swift v. City of Williamsburg, 24 Barb., 427.
And again, as hereinbefore stated, the action of the council from the first step taken in the matter, may *355 affect rights of property and result in divesting the title to property of one citizen, and transferring it to another. Hence the statute must be strictly construed, for it has been said that 'every statutory authority in derogation of the common law to divest the title of one, and transfer it to another must be strictly pursued, or the title will not pass.
In Creighton v. Mason, 27 Cal., 728, it is said that “when summary proceedings are authorized by statute, the effect of which is to divest or affect rights of property, the statute must be strictly construed, and the power conferred must be exercised precisely as given; any departure vitiates the whole proceeding.” Stucker v. Kelly, 7 Hill, 25. This rule of law is so well established upon principle, and authority, that it is unnecessary to cite authorities in support of it.
Eor the reason given in the discussion of the second general proposition, we think the action of the council, at least so far as regards the plaintiffs, was without authority and absolutely void, and therefore the decree rendered in the district court should be affirmed.
Decree accordingly.