Hanscom v. City of Omaha.

A. J. HANSCOM, APPELLANT, V. THE CITY OF OMAHA, APPELLEE.

**Municipal Corporations:** SPECIAL ASSESSMENTS: CONSTRUCTION OF SEWERS. In 1878, the mayor and council of the city of Omaha divided the city into sewer districts, numbered one and two, district one being about two and one-half miles in length, by one and three-fourths in width. They thereupon let contracts for the construction of a main sewer in the channel of a creek in said district, at a cost exceeding $30,000, and assessed all the real estate in the district for its payment, on the ground of benefits. *Held*, that special assessments could only be levied upon property specially benefited, and only to the extent of the benefits.

APPEAL from the district court of Douglas county. Tried below before SAVAGE, J. The opinion states the case.

*George E. Pritchett* and *Clinton Briggs*, for appellant, cited *In the matter of Albany street*, 11 Wend., 149. *Clapp v. City of Hartford*, 35 Conn., 66. *Mayor of Baltimore v. Hughes*, 1 Gill & Johnson, 480. *Creighton v. Manson*, 27 Cal., 614. *Washington Avenue*, 69 Penn. State, 357. *The State v. Newark*, 3 Dutcher, 186. *Tide Water Co. v. Coster*, 3 C. E. Green, 519. *Sharp v. Speir*, 4 Hill, 76. *Hill v. Higdon*, 5 Ohio State, 247. *Hurford v. Omaha*, 4 Neb., 344. *State, ex rel. Abbott, v. Dodge Co.*, 8 Neb., 124.

*G. W. Ambrose* and *John C. Cowin*, for appellee, cited Cooley on Taxation, 110, 449. *Turner v. Althaus*, 6 Neb., 54. *People v. Brooklyn*, 4 N. Y., 419. *Shaw v. Dennis*, 5 Gilm., 405. *Philadelphia v. Field*, 58 Penn. State, 320. *Langhorne v. Robinson*, 20 Grattan, 661. *Malchus v. District of Highlands*, 4 Bush, 547. *Challiss v. Parker*, 11 Kan., 394. *Hingham Turnpike v. County of Norfolk*, 6 Allen, 353. *Baltimore v. Hughes*, 1 Gill & Johnson, 480. *St. Louis v. Oeters*, 36 Mo., 456.

MAXWELL, CH. J.

In the year 1878 the city council of Omaha divided the city into two sewer districts, by a line running from the Missouri river, west along the center of Farnham street, to the western boundary of the city, and designated that portion of the city south of said line as sewer district No. 1, and that portion north as sewer district No. 2. Sewer district No. 1, as thus formed, was about two and one-half miles in length, and about one and three-fourths miles in width. A considerable portion of the territory in the south-west portion of the district has not been laid out into blocks and lots, and is not used for city purposes. A very large part of the land in the district is high and rolling, rising to one hundred feet or more above the Missouri river. South Omaha creek rises in the south-west portion of the district, and flows north-eastwardly and empties into the Missouri river, near the foot of Jones street, and furnishing natural drainage for surface water for a considerable portion of the district. The natural drainage of the south-east portion of the district is directly into the Missouri river, and it is impossible from the intervening high ground to connect drains from that portion of the district with South Omaha creek. The natural drainage of the north-western portion of the district is directly into district No. 2. Contracts were

let by the city authorities, and portions of two main sewers have now been constructed, one of which virtually follows the channel of South Omaha creek, and the other of a small stream that empties into said creek. No lateral sewers have yet been constructed, and the sewer, so far as the testimony discloses, is not yet used for sewerage purposes. The warrants drawn on the sewer fund exceed the sum of $30,000, and the entire cost will greatly exceed that sum.

A special tax of three per cent was enjoined, for reasons which need not be noticed, whereupon the following ordinance was passed:

"*Be it ordained by the city council of the city of Omaha:*

"Section 1. That ordinance No. 381, entitled, 'An ordinance making a levy to pay part construction of sewers in sewer district No. one in the city of Omaha,' approved November 2, A.D. 1878, be and the same is hereby amended to read as follows:

"That a special tax of two and one-half cents on each dollar be and the same is hereby levied upon all the real estate lying and being within sewerage district No. one, in the city of Omaha, Douglas county, state of Nebraska, and according to the valuation of such real estate as fixed by the last regular assessment made prior to the date hereof, to pay for the construction of sewers constructed in said sewerage district, it being hereby adjudged and determined that all of the said (real) estate is equally benefited by said sewers, the cost of which is to be defrayed by the proceeds arising from the foregoing special tax.

"Sec. 2. That the proceeds arising from said special tax shall constitute a fund to be designated and known as the sewerage fund of sewerage district No. one, and shall be used exclusively to pay off and discharge the indebtedness arising from the construction of sewers in said sewerage district," etc.

This action was brought to enjoin the collection of this tax, upon the ground substantially that it is not authorized by law. On the trial of the case in the district court, judgment was rendered in favor of the defendant. The plaintiffs appeal to this court.

The twenty-sixth paragraph of section 15 of "An act to incorporate cities of the first class," approved March 28, 1873 (Gen. Stat., 115), gives the mayor and council of each city governed by its provisions, power "to lay off the city into suitable sewer districts for the purpose of establishing a system of sewerage and drainage; to provide such system and regulate the construction and repairs and use of sewers and drains, and of all proper house connections and branches, and provide penalties for any destruction of or injury to any sewer or part thereof."

The eleventh subdivision of section 15 (Gen. Stat. 114) gives them authority "to establish, alter, and change the channels of streams and water courses within the city, and bridge the same. *Provided*, that any such improvement costing in the aggregate a sum greater than five thousand dollars shall not be authorized until the ordinance providing therefor shall be first submitted to, and ratified by a majority of the legal voters of such city voting thereon."

Sec. 52 provides that "special taxes may be levied by the mayor and council for the purpose of constructing sewers or drains within the city. Such taxes shall be levied upon all the real estate lying and being within the sewerage district in which such sewer or drain may be situated, and according to the valuation of such real estate as fixed by the last named regular assessment made prior to such levy, and all taxes or assessments for sewerage purposes shall be collected in the same manner as other special assessments are, and shall be subject to the same penalty.

Sec. 6, Art. IX, of the constitution of 1875, provides that "the legislature may vest the corporate authorities of cities, towns, and villages with power to make local improvements by special assessments, or by special taxation of property benefited. For all other corporate purposes all municipal corporations may be vested with authority to assess and collect taxes, but such taxes shall be uniform in respect to persons and property within the jurisdiction of the body imposing the same."

The words "by special assessment or by special taxation of the property benefited," refer to, and mean the same thing viz.: That special assessments may be made upon property to the extent of the benefits received by it. Taxation by special assessments differs from general taxation in this, that they can be imposed only to the extent of the special benefits received, while the benefits which the tax payer receives in return for general taxation are the enforcement of the laws, protection to life and property, and such other benefits as are shared by the public at large. The principle which underlies special assessments is, that the value of the property is enhanced to an amount at least equal to the assessment. This principle cannot be departed from without taking private property for public use. As was said in the case of *Tidewater Co. v. Coster*, 3 C. E. Green, 527–8, "where lands are improved by legislative action on the ground of public utility, the cost of such improvement, it has frequently been held, may, to a certain degree, be imposed on the parties who, in consequence of owning the lands in the vicinity of such improvement, receive a peculiar advantage. By the operation of such a system it is not considered that the property of the individual or any part of it is taken from him for the public use, because he is compensated in the enhanced value of such property. But

it is clear this principle is only applicable when the benefit is commensurate to the burden, when that which is received by the land owner is equal or superior in value to the sum exacted; for if the sum exacted be in excess, then to that extent, most incontestably, private property is assumed by the public. Nor, as to this excess, can it be successfully maintained that such imposition is legitimate, as an exercise of the power of taxation. Such an imposition has none of the essential characteristics of a tax. We are to bear in mind that this projected improvement is to be regarded as one in which the public has an interest. The owners of these waste lands have a special concern in such improvements so far as particular lands will be in a peculiar manner benefited. Beyond this their situation is like the rest of the community. The consideration for the excess of the cost of improvement over the enhancement of the property within the operation of the act is the public benefit. The expenditure of this portion of the cost of the work can only be justified on the ground of benefit to the public. I am aware of no principle that will permit the expense incurred in conferring such benefit on the public to be laid in the form of a tax on individuals."

That was a case where waste land was reclaimed, the cost being assessed in proportion to the benefits received. But the principle is applicable to the case at bar. The owner of lots has a special interest in such legitimate improvements as peculiarly affect his lots to the extent of the benefits received. But why should he be required to make public improvements beyond such benefits? As to the excess, it is not for his benefit but for that of the public, and the public should be required to bear the burden.

But it is said that the council has made a finding in the ordinance referred to, that the benefits are equal

to the assessment. It is sufficient to say that the finding is a fraud on its face. A large part of the so-called sewer district No. one never can receive any special benefit from the construction of this sewer, and a considerable part of the remainder will not require sewerage for many years to come. The principal objects of the present sewer seem to be to furnish a permanent channel for the creek, an outlet for sewers hereafter constructed, and permanent and substantial culverts across the streets intersecting the creek. In no sense can it be called a local improvement. It is for the benefit of the entire city, and not of particular individuals. So far as appears there is not a single lot exceptionally benefited unless it be some of those in the bed of the creek. The finding therefore is incorrect, and in any event is insufficient to show special benefits.

But it is said that the mayor and council had authority to form suitable sewer districts, and that having formed the same, their judgment cannot be reviewed in this action. The answer to this objection may be found in the definition of "sewer." Webster defines a sewer to be "a drain or passage to convey water or filth under ground, a subterraneous canal, particularly in cities." A sewer district, therefore, should be composed of such territory as could be drained directly by the sewer. It would not be necessary to construct the entire sewer at one time, but in such case the cost of construction could not be levied upon property not specially benefited. The case would not differ materially from that of paving a street. If the street was not paved the entire length, the cost could not be imposed on property adjoining that part of the street not paved. Neither could the cost be imposed on property on an adjoining street, because the benefits received are those shared by the public at large.

The power to form a sewer district does not confer

authority to form a taxing district, upon which to levy taxes for the construction of sewers upon property not exceptionally benefited by their construction.    Therefore when the mayor and council formed a sewerage district by arbitrary lines, and without regard to the topography or drainage of the city, and made such sewer district a taxing district upon which special assessments might be levied for the construction of sewers in any part of the district without regard to the special benefits to property, they exceeded their authority and their action therein is a nullity.

The limitations in a charter upon the power of the mayor and council to impose taxes is one for the protection of the tax payers of the municipality against the abuse of such power by their own agents.    The mayor and council cannot expend to exceed $5,000.00 without a vote of the electors, for changing or establishing the channels of streams or watercourses within the city, and bridging the same.    Can they evade this beneficent provision by subdividing the city into taxing districts, and levy special assessments therein without limit or restriction? It is unnecessary to say that they possess no such power.  Their authority is derived wholly from the statute, and they have no powers except such as are expressly given or are incidentally necessary to carry the same into effect, and their actions in excess of such powers are absolutely null and void.

The power of the mayor and council to levy special assessments for local improvements is limited under our present constitution to cases where the improvement confers special benefit on the property assessed, and to the extent of those benefits.

The case of *Hurford v. Omaha,* 4 Neb., 336, arose under the constitution of 1866, and has no application to the case at bar.    The appellees, however, insist that

the constitution of 1866, and not that of 1875, governs in this case because the charter was passed prior to the year last named, and not being repugnant to the provisions of the constitution of 1866 is expressly saved ·by the schedule, and a number of cases to which we will refer are cited, which, it is claimed, sustain that view.

In the case of *Cass v. Dillon*, 2 Ohio State, 607, the legislature of Ohio passed an act on the 24th of March, 1851, authorizing the county of Muskingum to subscribe to the capital stock of the Cincinnati, Wilmington and Zanesville Railroad Company upon condition ·that such subscription should be first approved by a majority of the qualified electors of the county, to be ascertained at an election held upon notice for that purpose. This vote was taken on the 14th·of October of that year, and a majority voting in favor of the subscription, the county commissioners, on the 25th of the same month, subscribed, in the name of the county, $100,000.00 to the capital stock of the company. On the 1st day of September of that year the new constitution took effect, which contained a provision that "the general assembly shall never authorize any county, town, or township by vote of its citizens or otherwise to become a stockholder in any joint stock company, corporation or association whatsoever, or to raise money for, or loan its credit to or in aid of any such company, corporation, or association." It was held by a divided court—two judges dissenting, that the above prohibition did not apply to existing laws, but merely prohibited future legislation of this character. We cannot give our assent to the law as laid down in that case. See also *Allbyer v. The State*, 10 Id., 589.

In the case of *The State v. Weston*, 4 Neb., 216, it is said that the constitution is the supreme law of the state emanating directly from the body of the people.

If such is the case, if the constitution is the supreme law of the state, then whatever cannot now be authorized by the legislature cannot continue in force by virtue of legislation under our former constitution and in force at the time the present constitution took effect. Such legislation, being in conflict with the supreme law, must yield to it. ' And this is the rule laid down by this court. *B. & M. R. R. v. Lancaster County*, 4 Neb., 305. *State v. Lancaster Co.*, Id., 537. *Dundy v. Richardson Co.*, 8 Neb., 508. *B. & M. R. R. v. York Co.*, 7 Neb., 486. *B. & M. R. R. v. Saunders Co.*, 9 Neb., 507.

All laws in force at the time of the adoption of our present constitution in conflict with its provisions, and under which rights had not become vested, were thereby repealed so far as they were inconsistent. Sec. 52 therefore, so far as it is inconsistent with the constitution, is repealed. The judgment of the district court is reversed, and the injunction heretofore granted made perpetual.

DECREE ACCORDINGLY.