[No. 3745.]

IRVIN MURRAY v. THE STATE.

1. PRACTICE.—SPECIAL VENIRE, which shows the style and number of the case, and which, though in its preliminary recitals it omitted the name of the court or county in which the case was pending, distinctly stated in the mandatory part that the persons named were to be summoned "to be and appear before the honorable district court of Williamson county, Texas, at the court house thereof, in Georgetown, on the nineteenth day of January, A. D. 1886, then and there to serve as special jurors, as aforesaid, in the above stated cause," etc., is not obnoxious to the objection that the writ does not show in what case the same was issued, nor in what cause the said proceedings were pending.

2. SAME.—It was not error to permit the sheriff to amend his return upon the special venire facias.

3. SAME.—Article 617 of the Code of Criminal Procedure requires no more than that the names of all the jurors summoned under the special venire shall be served upon the defendant more than one day before the case is called for trial. The provisions of the said article are not subverted by the mere fact that the certified copy served on the defendant contained other names, which were erased.

4. SAME—INTERPRETATION OF THE CODES.—It is an established rule of statutory construction that, "When the particular provision of a statute relates to some immaterial matter, where compliance is a matter of convenience rather than substance, or where the directions of a statute are given with a view to the proper, orderly, and prompt conduct of business merely, the provision may generally be regarded as directory." With respect to this doctrine this court has established the rule that, "When ever there is reason to apprehend that injury may have resulted to the defendant, especially in a case of felony, from a failure to observe directions given the court by the Legislature, the judgment should be reversed." Held, that Articles 618, 619, 620, and 621 of the Code of Criminal Procedure, relating to the organization of the trial jury in a case of capital felony, are directory only, and the failure of the trial court to conform to them is not reversible error, unless injury to the defendant be shown. Note the opinion for a case in which no injury is shown to have resulted from a disregard of said articles.

5. SAME—NEW TRIAL.—CONTINUANCE was applied for to secure the attendance of four witnesses. It is shown that two of them appeared in court before the conclusion of the testimony, but were not placed upon the stand by the defendant. The testimony of the remaining two, considered in connection with the evidence adduced upon the trial, does not appear to have been of a character material to the defense. Held, that the refusal of the continuance was not cause for new trial.

6. MURDER—FACT CASE.—See the statement of the case for evidence held sufficient to support a capital conviction for murder.

APPEAL from the District Court of Williamson. Tried below before the Hon. A. S. Walker.

The death penalty was assessed against the appellant, by the verdict which found him guilty in the first degree, under an indictment which charged him with the murder of Mollie Murray, in Williamson county, Texas, on the eighteenth day of December, 1885. The murdered woman was the wife of the appellant.

Grandison Sansom was the first witness for the State. He testified that he was the son of the deceased, Mollie Murray, and the step-son of the defendant. He was eleven years old. The witness was sick on the afternoon of December 18, 1885, and went to bed just before sun down, in the house, in the town of Taylor, in Williamson county, in which his mother, the deceased, and her husband, the defendant, then lived. Soon after supper was eaten by the inmates of the house, which was soon after dark, the defendant left the house to go to town. At that time a lamp was burning on a table standing in the room occupied by the witness. When the deceased finished clearing off the table, she arranged to take a bath in the shed room, which was used as a kitchen. That room adjoined witness's room on the north, the two being separated by a plank partition, and connected by a door. At this point the State introduced in evidence a diagram of the house, which is as follows. [See page 468 for diagram.]

The witness lay on his bed, in the south east corner of a large room, as shown by the diagram, and could not see his mother from that point, while she was bathing in the kitchen. After some time, and while the deceased was still bathing, the defendant came back, passed through the witness's room into the kitchen, and beyond the view of the witness. Witness presently heard the defendant say to the deceased : "You have been untrue to me; who is it you are keeping in Round Rock and Georgetown?" The defendant, a moment later, said to deceased: "Get out of that bath and sit down in that chair. I am going to kill you!" Deceased replied : "I will mind you," and a moment later: "Don't kill me." This appeal was followed by two blows, struck, the witness thought, with a pistol. The sound of the blows was followed by a louder noise. When the defendant and the deceased commenced talking in the kitchen, the witness covered his head with the bed clothes, and could not see in the kitchen. After the noises described some one (the defendant, as

Statement of the case.

witness believed), came into his room, from the kitchen, and extinguished the light that was still burning. The witness did not uncover his head. When the light was blown out the person went back into the kitchen, and the witness heard the opening and closing of the back door leading out from the kitchen. Some time after this the defendant returned to the house with the preacher, the Reverend J. C. Williams. Witness had not yet recovered from his fright, and had not uncovered his head. During the time intervening between the closing of the kitchen door and the arrival of the defendant and the preacher, the witness heard a noise in the kitchen which sounded like the moving of feet over the floor. Witness did not move from his bed, and did not know what had happened to his mother until the preacher and defendant reached the house. Witness could not tell how long after the light in his room was blown out it was until the defendant came back to the house with the preacher, but no one came into the house during the interval. Witness was awake through out that interval, and heard no other noise in the house than the raking of feet over the kitchen floor. After the arrival of the defendant and the preacher, when the lamp was lighted, witness saw his mother lying in the kitchen where she had been bathing. She was unable to talk, and died about ten o'clock on the next morning. Witness told Mrs. Foster, on the night of the killing, that he did not see the defendant on that night, and that he did not know who assaulted his mother. He was afraid to tell Mrs. Foster anything else at that time. But when, on the same night, he was taken to Mrs. Burke's house, he told Mrs. Burke and Melinda Bishop the facts to which he has testified on this stand, and that the defendant assaulted his mother. Defendant had a razor in the house at the time, and likewise owned an ax, which was kept on the place except when borrowed by neighbors.

Reverend J. C. Williams testified, for the State, that he preached in the town of Taylor, in Williamson county, on the night of Friday, December 18, 1885. Witness had but recently been called to the pastorate of the Happy Hollow colored Baptist church, located in the said town of Taylor. He was a stranger in that town, and had been assigned lodgings at the house of the defendant, who was a deacon of the Happy Hollow church. Witness began services on the night in question at the usual hour. The defendant did not reach the church until about twenty minutes before the conclusion of the services, which was

after nine o'clock. Witness, defendant, Jim Womack, and perhaps others, left church together, going in the direction of the defendant's house, which stood near a quarter of a mile from the church. Before reaching defendant's house, witness and defendant separated from the other parties. They reached the defendant's house not exceeding thirty minutes after the defendant entered the church. Witness and defendant stepped on the front, or south gallery, together. Witness stopped on the gallery, and defendant went into the large room where the boy Grandison Sansom was sleeping, and lit a lamp. Witness heard defendant ask the boy how the back door came open. Defendant then returned to the witness with the lamp, and showed the witness into the room he was to occupy, which was the south east room of the house, the door of which opened on the gallery. Defendant placed the lamp on a chair, and witness sat down on the side of the bed. Defendant then went back to the main room, occupied by the boy, and lit another lamp. Shortly afterwards the witness heard the defendant in that room "snuffling," or weeping. Witness could not say that defendant had, or had not, been into the kitchen up to that time. He may have gone into the kitchen from witness's room, and it was even possible that the "snuffling" may have issued from the kitchen. Witness could not see into the main room, or kitchen, from his room. Defendant then came to the gallery, still "snuffling," and went back into the big room, and perhaps into the kitchen. He presently returned to the gallery, and witness asked him what was the matter with him. Defendant replied: " My God! just look; some body has murdered my wife!"

The witness went into the kitchen and found Mollie Murray lying on the floor, just east of the door which connected the kitchen and the big room. She lay near a tub of water, and was partially dressed. A chair stood near the tub, and a. bloody ax lay near the prostrate body. The body was very bloody. Witness discovered at once that the woman was not dead, and directed the defendant to summon help immediately and to dispatch for a doctor. Defendant then called from the door, and Jim Womack and William Piper came to the house. One of those parties found a bloody razor on the kitchen floor, and offered it to the witness, requesting him to take charge of and keep it, which, however, the witness declined to do. The razor was then placed on a sewing machine which stood near by, and the defendant took it with the remark: " That is the razor with

which my wife was killed. I will take it and take care of it."
Witness never saw the razor afterwards. A crowd, including
the doctor, soon arrived, and witness left the defendant's premi-
ses, and saw no more. Mollie Murray's throat was cut, and she
was struck over the head two or three times, as shown by the
wounds.

Ed Sansom testified, for the State, that the defendant was a
barber by trade, and at times worked in the witness's shop. De-
fendant owned razors which he kept at his house.

William Piper testified, for the State, that he was called to the
defendant's house on the night of December 18, 1885. On his ar-
rival he found the Reverend J. C. Williams, the defendant, and
Jim Womack present. Deceased lay on the floor of the kitchen
just east of the big room door. Witness saw two smooth, clean
razor or knife cuts on the side of her throat, and other wounds
on her head. A bloody ax lay on the floor, a foot or two distant
from the woman's side. Witness found a bloody razor on the
floor near the body, which he put on the sewing machine, tell-
ing defendant to take care of it. Witness did not know who
owned the ax or razor.

Doctor C. Salms testified, for the State, that about ten or be-
tween ten and eleven o'clock, on the night of December 18, 1885,
he was called to see the deceased. He found her lying on the
floor in the kitchen, the defendant kneeling by her, expressing
grief. Witness found two shallow cuts on her throat, and three
wounds on her head, two of which fractured the skull. One of
the two blows which fractured the skull drove fragments of bone
into the brain. The deceased died about noon on the next day,
from the effects of the blows on her head. These wounds were
inflicted with a blunt instrument of some kind.

Matilda Bishop testified, for the State, that in August, 1885,
she was at the house of the defendant, when he told her that he
was going to whip his wife, the deceased. Witness told the de-
ceased, who there upon fled to witness's house. Defendant locked
up his house and followed deceased to witness's house. Witness,
who was still in defendant's house when he locked the door,
managed finally to escape through a window, when she ran
home. Not finding the defendant and the deceased at her house,
she went back to the defendant's house, and found them. De-
fendant had a rope tied around the deceased's neck, and was
whipping her. He whipped her until the blood ran to the floor
from her body. Defendant then produced a pistol and threat-

ened to kill his wife. Witness and, deceased begged him to desist, which he finally did, with the remark that if his wife told any one about the beating, he would certainly kill her. On another occasion, during a visit of the witness to the house of the defendant, he came home and went to the water bucket to get a drink of water. Finding no water in the bucket, he became enraged, seized a hatchet and bursted the bucket to staves, and remarked to his wife that he would like to burst her head in the same way. On each of the occasions mentioned Grandison Sansom was present.

John T. Olive, sheriff of Williamson county, Texas, testified, for the state, that in December, 1885, a few days before the death of the deceased, witness served on defendant a petition for divorce sent from Robertson county, Texas, together with citation in the case. Witness asked defendant: "Are you married to that woman in Robertson county?" Defendant replied : " Yes, that's what the woman says." Witness then asked him: "Are you also married to the woman here?"—meaning deceased. After some hesitation he replied: " Yes, they say so."

John Smoot testified, for the State, that he attended services at the Happy Hollow colored Baptist church in Taylor, on the night of December 18, 1885. Defendant came into the church after nine o'clock, and near the conclusion of the service. He was "blowing" or breathing rapidly, and some one near witness remarked that the defendant had been running. Defendant, after a few minutes, moved from the back seat farther up the aisle, and finally went to the " amen corner."

Jim Womack testified, for the State, that he went to the defendant's house about one o'clock on the eighteenth day of December, 1885, and found the defendant shaving. Witness asked defendant to let him shave too. Defendant agreed, but, as witness then caught sight of defendant's wife weeping, he concluded to go on down town. Witness went by defendant's house that night at about seven o'clock to get defendant to go to church with him. Defendant replied that he had an appointment with another person to go to church, and could not go with witness. Witness and defendant went to town together and separated, witness going on to church. Defendant came into the church after nine o'clock very hurriedly, and alone. He first took a back seat, but soon moved up the aisle to a seat near witness, whence he presently went to a seat in the " amen corner." Witness had never before seen the defendant act so. The witness

went part of the way home with the defendant, and the preacher. Witness was afterwards called to the defendant's house, where he found the deceased lying on the floor, wounded in the manner described by previous witnesses. A bloody ax, and another heavy instrument lay on the kitchen floor.

Jane Carrington testified, for the State, that in December, 1885, she lived immediately across the alley from defendant's house, about fifty feet distant. Witness was at home through out the night of the eighteenth of that month. She neither heard nor saw any one go to or leave the defendant's house on that night, nor did she hear any noise or disturbance in his house.

Lucy Mitchell testified, for the State, that she was at the defendant's house on the night that deceased was wounded. She saw the defendant take a razor from a sewing machine, and heard him say: "This is the razor with which my wife was killed."

N. Moreland testified, for the State, that he saw the defendant when he came into church, after nine o'clock on the night of December 18, 1885. Defendant entered the church rapidly and sat down near the door, and wiped his face and hands on his handkerchief. He then moved to a seat in the "amen corner," and again wiped his face and hands.

The testimony of George Hardy, for the State, was in substance the same as that of the witness Moreland. No evidence was introduced by the defense.

The motion for new trial raised the questions discussed in the opinion.

*John W. Parker* and *Fisher & Townes* filed an able and exhaustive brief for the appellant.

*J. H. Burts*, Assistant Attorney General, for the State.

WHITE, PRESIDING JUDGE. A motion was made to quash the special venire summoned to try the case,—first, because said writ does not show in what case the same was issued, nor in what cause the said proceedings were pending; and, second, because the return of the officer upon the said writ is insufficient, in that it does not show the diligence used by said officer in his efforts to find the jurors not served.

The first objection is not borne out by the record, because the writ of special venire which was issued in the case shows the

style and number of the case, and, whilst it may be true that in the preliminary recitals the name of the court or county in which the case is pending is omitted, it is distinctly stated in the mandatory part of the writ that the persons named are to be summoned "to be and appear before the honorable district court of Williamson county, Texas, at the court house thereof, in Georgetown, on the nineteenth day of January, A. D. 1886, then and there to serve as special jurors, as aforesaid, in the above stated case," etc. This is in substantial compliance with the provisions and requirements of our statutes in regard to such writs. (Code Crim. Proc., Arts. 605 and 608.)

With regard to the second objection urged in the motion to quash said writ, it is shown by the sheriff's return that seven names of the persons whom he was required to summon had been stricken from the list by him; but he failed to state in his return why this was done, and if because they had not been summoned, then the return was defective in failing to state the diligence that had been used to summon them, and the cause of the failure to summon them as is required by law. (Code Crim. Proc., Art. 614.)

This motion to quash the special venire was overruled, and upon motion of the district attorney, the sheriff, over objections of the defendant, was permitted to amend his return upon said writ in reference to the particular indicated; and the defendant reserved an exception to the ruling of the court allowing said amendment.

There was no error in this action of the court, the return of the sheriff being amendable, and no possible prejudice to the defendant being shown. (Washington v. The State, 8 Texas Ct. App., 377; Sterling v. The State, 15 Texas Ct. App., 249.)

After the amendment of the return of the sheriff, the appellant moved the court that he have one day's service of the copy of said special venire as amended, before he should be compelled to go to trial. He had already been served with a copy of the special venire more than one day before he made his aforesaid motion to quash the same, but he contended that the certified copy furnished him was not, in fact, a true copy of the names summoned as shown in the amendment made by the sheriff.

This objection was not well taken. The certified copy served on the appellant, it is true, did contain the names of the seven jurors who had not been summoned, but their names were obliterated by having a pencil mark drawn through them. The

names of all the persons *summoned* under the special venire were served upon the defendant more than one day before the case was called for trial, and that is all that the statute requires. (Code Crim. Proc., Art. 617.)

It is insisted that the court committed a radical error in failing to comply with the requirements of the statute as to the mode and manner of selecting and organizing the jury from and out of the special venire as summoned; that the court, in proceeding to impanel the jury, did not have the names of those summoned as jurors called at the court house door, and require such as were present to be seated in the jury box, nor did the court afford the defendant an opportunity to apply for attachments for those not present. (Code Crim. Proc., Art. 618.) Nor did the court call up and swear or have sworn all those present, and test their qualifications, or hear their excuses, or afford appellant any opportunity of knowing who were present in obedience to the special venire facias (Code Crim. Proc., Arts. 619, 620, 621); but, on the contrary, the mode adopted for the organization of the jury was that prescribed by Article 640 of the Code of Criminal Procedure, without complying with any of the requirements of the statute as provided in the Articles above named.

The name of each individual juror was called in the order that it appeared on the list, and he was separately tested as to his qualifications by the court, the district attorney, and the appellant, and this method was pursued, over the objections of appellant, until the panel of the jury was completed. Appellant's objection is that the mode of impaneling the jury as pursued by the court was in direct contravention of the provision of the statute, and deprived this appellant of certain important rights accorded him by law. He insisted that the purpose and intent of Articles 618, 619, 620, and 621, of the Code of Criminal Procedure, was that all those summoned on the special venire should be sworn in a body, and all excuses heard and determined, and their qualifications ascertained, and absentees noted, so that the defendant in a capital case will only have a panel of qualified jurors, without legal excuse, in actual attendance, upon whom to expend his challenges and from whom to select his jury; that the mode adopted by the court of organizing the jury deprived him of those important rights and necessary privileges, and he was compelled to pass upon each juror tendered him without possibly knowing who of those remaining upon the list was disqualified, had excuses, or were absent.

It is provided by statute that, "when any capital case is called for trial, and the parties have announced ready for trial, the names of those summoned as jurors in the case, shall be called at the court house door, and such as are present shall be seated in the jury box, and such as are not present may be fined by the court a sum not exceeding fifty dollars, and, at the request of either party, an attachment may issue for any person summoned who is not present, to have him brought before the court." (Art. 618, Code Crim. Proc.)

Article 619: "When those who are present are seated in the jury box, the court shall cause to be administered to them the following oath: "You, and each of you, solemnly swear that you will make true answers to such questions as may be propounded to you by the court, or under its directions, touching your service and qualification as a juror, so help you God."

Article 620: "The court shall now hear and determine the excuses offered by persons summoned, for not serving as jurors, if any there be, and if an excuse offered be considered by the court sufficient, the court shall discharge the person offering it from service."

Article 621: "A person summoned upon a special venire may be excused from attendance by the court at any time before he is impaneled, by consent of both parties."

These are the preliminary steps provided by the law for the preparation of the special venire, so that a jury may be selected there from. And there is no doubt but that they should be followed, and that it would be better in practice, in this, as in all cases where the mode of procedure has been prescribed for the State, to follow the rules as adopted for the government and conduct of the trial of her citizens. It is to be presumed that such rules have been adopted for some wise purpose.

In this instance the learned judge has seen fit to ignore the rules thus prescribed, though his attention was attempted to be called to them by the objections of counsel for defendant, and his action was promptly excepted to at the time, as shown by defendant's bill of exceptions in the record. That his action is in contravention of the statute can not be denied. If it is erroneous, then the judgment must necessarily be reversed. His action is inevitably erroneous if the statutes quoted are mandatory. If not, then the action, whilst it establishes a patent irregularity, is not a reversible matter. Are the statutes mandatory or directory?

---

---

"In respect to statutes," says Mr. Cooley, "it has long been settled that particular provisions may be regarded as *directory merely*; by which is meant that they are to be considered as giving directions which *ought* to be followed, but not as so limiting the power in respect to which the directions are given that it can not effectually be exercised without observing them." Again, the same learned author says: "Those directions which are not of the essence of the thing to be done, but which are given with a view merely to the proper, orderly, and prompt conduct of the business, and by failure to obey which the rights of those interested will not be prejudiced, are not commonly to be regarded as mandatory; and if the act is performed, but not in the time, or in the precise mode indicated, it may still be sufficient, if that which is done accomplishes the substantial purpose of the statute." (Cooley's Const. Lim., 4 ed., pp. 89 and 93.)

In the well considered case of Hurford v. The City of Omaha, the court, amongst others, lays down the following rule as a safe guide in the interpretation of statutes relating to the question under consideration, namely: "That when the particular provision of the statute relates to some immaterial matter, where compliance is a matter of convenience rather than substance, or where the directions of the statute are given with a view to the proper, orderly, and prompt conduct of business merely, the provision may generally be regarded as directory." (4 Neb., 336.)

This court, in the case of Wilkins v. The State, without attempting to lay down definite rules for determining whether a statute is mandatory or directory, adopted as a safe and sound conclusion the remarks of Judge Moore in the case of Campbell v. The State, 42 Texas, 591, to the effect that, "when ever there is reason to apprehend that injury may have resulted to the defendant, especially in a case of felony, from a failure to observe directions given the court by the Legislature, we think, unquestionably, the judgment should be reversed." (15 Texas Ct. App., 420.)

In the case we have under consideration, the statutes quoted above relate entirely to matters of procedure, and are directory, and if it were possible that an injury could result from a non-observance of such rules, then no such injury is shown in this record, because the jury, as impaneled to try the case, was selected from the original special venire, which was not exhausted in the selection, and the selection was made in conformity with Article 640, Code of Criminal Procedure (Charles v. The

State, 13 Texas Ct. App., 658), which is the mode prescribed for the final selection of the jury which is to try the case.

Another error assigned is that the court overruled defendant's application for continuance. Four witnesses were named in the application. Two of them appeared in court before the testimony was closed, and they were not called by defendant to testify. As to the other two, even if it be conceded that proper diligence to secure their attendance is shown, then their proposed testimony, viewed in the light of the other testimony in the case, does not appear to be material, and consequently no error is made manifest in the action of the court.

No complaint is made of the charge of the court to the jury. It presented the law plainly, fully, and fairly. As to the evidence, no unprejudiced mind can say that it does not amply support the verdict and judgment, which condemns this defendant to death for the cruel and inhuman murder of his own wife. There is no reversible error in the record, and the judgment is, therefore, in all things affirmed.

*Affirmed.*